UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
WAYNE THOMPSON,

                                        Petitioner,

-against-

NORMAN BESIO, Superintendent, Great
Meadow Correctional Facility,

                                        Respondent.
-----------------------------------------------------------------x

MEMORANDUM & ORDER

11-CV-2752 (ENV)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 15 2014 ★
BROOKLYN OFFICE

VITALIANO, D.J.

Petitioner Wayne Thompson is before the Court, pro se, on his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the writ is denied and Thompson's petition is dismissed.

## Background

Thompson's conviction stems from two robberies in Queens.[1] On June 24, 2004, Dr. Lawrence Lefcort, a dentist whose office was located at 87-40 165th Street, received a telephone call from the police informing him that someone had broken into his office and stolen personal property. (Trial Transcript, April 5–7, 11–12, 17–18, 25–28, 2006 ("Tr."), 577–79.) Almost a month later, on July 20, 2004, at approximately 1:30 P.M., William Flamaropol tried to enter his home at 85-08 165th Street. As Flamaropol attempted to unlock the door, someone inside latched

---

[1] Because Thompson was convicted, the Court recites the facts in the light most favorable to the verdict. See Garbutt v. Conway, 688 F.3d 79, 80 (2d Cir. 2012).

1

the door, barring his entry. (Tr. 296–97.) Flamaropol promptly called the police. When officers arrived only minutes later, no one was in the house, and several items of property were missing.

Thompson was convicted of committing both crimes, after a jury trial before Justice Joel Blumenfeld, in Queens County Supreme Court, on April 28, 2006.

A. The "Other" Wayne Thompson

Strangely, owing to information provided by two witnesses to the June 24th incident, the police initially suspected a different individual, also named Wayne Thompson (the "other" Wayne Thompson), of committing the robberies. (Tr. 788–89, 796–97; Resp. Br. 3; Pretrial Proceedings, April 3–4, 2006 ("Pretrial Tr."), 7–9.) Police were able to link the other Wayne Thompson to the July 20th robbery as well because DNA evidence recovered from the crime scenes indicated that the same individual had committed both the June 24th and July 20th crimes. (Tr. 631–32.)

On April 7, 2005, the other Wayne Thompson was arrested in Florida on an unrelated matter.[2] Following his arrest, on May 5, 2005, the People obtained a grand jury indictment. (Queens County Indictment No. 1105/05.) Police then arrested the other Wayne Thompson in Florida on a New York warrant. Subsequently, however, further investigation made clear that the other Wayne

---

[2] Although it is not entirely clear from the parties' submissions, or the transcripts of the trial or pretrial proceedings, the Court infers that the Wayne Thompson arrested in Florida is the same "other" Wayne Thompson, with NYSID number 04675480Z, who was initially suspected of committing the June 24th crime. (See Pet. Ex. 13, Proceedings Before Justice Griffin, May 19, 2005 ("May 19 Proceedings"), 4.)

2

Thompson had a solid alibi for the dates in question, and his DNA did not match samples collected at the two crime scenes. As a consequence, the other Wayne Thompson was released and the search for the true culprit resumed. (May 19 Proceedings 4–8.)

B. Petitioner's Arrest

Thompson was originally arrested on suspicion of his involvement in an unrelated burglary on August 14, 2004.[3] Nine months later, on May 18, 2005, after it had become clear that the other Wayne Thompson was not responsible, additional checks of NYPD's electronic database identified petitioner as a possible perpetrator of the June 24th and July 20th burglaries. (Tr. 419–20.) On May 23, 2005, with petitioner's consent, an NYPD detective took a forensic swab from petitioner's mouth upon his appearance in court on the unrelated August 14th arrest. (Tr. 391–93; Pretrial Tr. 21.)

Meanwhile, the New York City Office of the Chief Medical Examiner ("OCME"), which handles certain kinds of forensic analysis for NYPD, compared the DNA profiles created from the June 24th and July 20th crime scene materials to petitioner's DNA, and determined that Thompson was the same person whose DNA had been found at both scenes.[4] Petitioner was placed under arrest on or about July

---

[3] Thompson proceeded to trial in that unrelated case. (Queens County Indictment No. 2192/04.) A jury convicted him of criminal trespass in the fourth degree and petit larceny. On July 17, 2006, he was sentenced to a determinate term of imprisonment of one year.

[4] During the initial investigation of the two burglaries, following a search of the National DNA Index, on November 22, 2004, the Florida Department of Law Enforcement reported a match

12, 2005. (Pretrial Tr. 21.) On November 2, 2005, petitioner was arraigned for burglary in the second degree, N.Y. Penal Law § 140.25[2], burglary in the third degree, N.Y. Penal Law § 140.20, and two counts of petit larceny, N.Y. Penal Law § 155.25.[5] (Queens County Indictment No. 2572/05.)

## C. Trial, Conviction and Sentencing

Thompson's jury trial began on April 5, 2006. Thompson represented himself, with the aid of a legal advisor appointed by the court. On April 28, 2006, petitioner was convicted of burglary in the second degree and burglary in the third degree. (Tr. 970.) On July 31, 2006, Justice Blumenfeld sentenced Thompson to a determinate prison term of seven years for the second-degree burglary conviction and five years post-release supervision. (Sent. Tr. 22.) Petitioner was also sentenced to time served for the third-degree burglary conviction. (Id.)

## D. Post-Trial Procedural History

---

between the blood recovered from the June 24th burglary and Florida convicted offender sample number 2000-21810, belonging to an individual named Wayne Thompson, Florida identification number 03096499. (Pet. Ex. 13, Proceedings Before Justice Griffin, May 19, 2005 ("May 19 Proceedings"), 3; Pretrial Tr. 7–9; Resp. Br. 4.) In addition to matching the DNA found at both crime scenes, petitioner's DNA also matched Florida sample 2000-21810. (That both Wayne Thompsons had connections to New York and Florida appears to be entirely coincidental.)

[5] Petitioner was initially arraigned on July 18, 2005 under indictment number 1105/05. (Resp. Br. 6 n.4.) The People argued that this indictment was valid with respect to petitioner because it was related to the "Wayne Thompson" with Florida identification number 03096499 who donated convicted offender DNA sample number 2000-21810, which matched petitioner's DNA, as well as the DNA from the June 24th and July 20th crime scenes. (See e.g., Pretrial Tr. 5.) However, on September 14, 2005, Supreme Court dismissed indictment number 1105/05 with respect to petitioner, because, during the grand jury presentation, one of the witnesses referred to the NYSID number of the other Wayne Thompson. (Resp. Br. 6 n.4.) On September 19, 2005, the parties were notified of the court's decision dismissing indictment number 1105/05 and the matter was adjourned for re-presentment to another grand jury. (Id.) Petitioner was indicted under indictment number 2572/05 on October 17, 2005, and rearraigned on November 2nd. (Id.)

On December 29, 2006, Thompson appealed his conviction to the Appellate Division, Second Department. On February 9, 2010, the Appellate Division affirmed petitioner's conviction. People v. Thompson, 70 A.D.3d 866, 895 N.Y.S.2d 148 (2d Dep't 2010). Petitioner then sought leave to appeal to New York's high court. (Letter Requesting Leave to Appeal, March 10, 2010 ("Leave Letter"), 1–3). On June 9, 2010, the Court of Appeals denied leave. People v. Thompson, 15 N.Y.3d 757, 906 N.Y.S.2d 830 (2010).

On June 6, 2011 Thompson timely filed this petition for a writ of habeas corpus, which, read liberally, enumerates six grounds for relief: (1) denial of his speedy trial right; (2) prosecutorial misconduct, including (a) unlawful collection of petitioner's DNA, and (b) "unlawful abduction of [petitioner] and his [pro se] attorney work product;" (3) Brady violations; (4) violation of petitioner's right to confront the witnesses against him; (5) "improper admission of the Florida DNA profile;" and (6) insufficient evidence to support the verdict. (Pet. 2; see also Pet. Br.) Thompson is currently on supervised release, residing in New York.[6] See NYDOCCS, Inmate Lookup, http://nysdoccslookup.doccs.ny.gov/ GCA00P00/ WIQ1/ WINQ000 (last visited Mar. 10, 2014).

## Legal Standard

---

[6] A district court may entertain a prisoner's petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). However, courts have construed the term "in custody" to extend beyond physical incarceration; it has been interpreted to include individuals who, at the time of the filing of the petition, were on parole, see Jones v. Cunningham, 371 U.S. 236, 243 (1963), or supervised release, see Scanio v. United States, 37 F.3d 858, 860 (2d Cir. 1994).

5

Under the Antiterroism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d); see also Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. Harrington v. Richter, 131 S. Ct. 770, 785 (2011); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S. Ct. at 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5 (1979)). Review under AEDPA "demands that state-court decisions be given the benefit of the doubt." Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam) (internal quotation marks omitted). Where AEDPA deference applies, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. Id. at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle of the facts of" the case. Id. at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Id. at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). However, a federal court may reverse a state court ruling only where it was "so lacking in justification that there [is no] possibility for fairminded disagreement." Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (quoting Harrington, 131 S. Ct. at 786–87). "If this standard is difficult to meet—and it is— that is because it was meant to be." Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted). Federal courts should not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas review is the remedy." Id. (citation omitted).

## Discussion

A. <u>The Speedy Trial Claim</u>

Petitioner attacks his conviction on the ground that his right to a speedy trial was violated. As a threshold matter, this claim is unexhausted.[7] Petitioner presented his speedy trial claim to both the Appellate Division and the Court of Appeals as a state statutory claim under CPL § 30.30, not as a potential violation of his federal constitutional rights.[8] See <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)); <u>Daye v. Att'y Gen. of the State of N.Y.</u>, 696 F.2d 186, 194 (2d Cir. 1982). As a result, the Court finds that the claim was not fairly presented to New York courts, and is unexhausted for the purpose of federal habeas review. See <u>Torres v. Ercole</u>, No. 08-CV-0414, 2012 WL 911871, at *2 (E.D.N.Y. Mar. 16, 2012). Since petitioner no longer has a state court forum in which to raise his unexhausted on-the-record claim, it is deemed exhausted but procedurally barred. See <u>Torres</u>, No. 08-CV-0414, 2012 WL 911871, at *2 n. 4; <u>Spence v. Superintendent</u>, 219 F.3d 162, 170 (2d Cir. 2000). Claims that are procedurally barred may only be reviewed if petitioner establishes cause for the default and resulting prejudice, or that a fundamental miscarriage of justice will result from non-review of the claim. <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir.

---

[7] Although the exhaustion requirement is waivable, and the state has not raised it here, under AEDPA a state is not deemed to have waived its exhaustion defense unless, through counsel, it states expressly that it is doing so. See 28 U.S.C. §2254(b)(3).

[8] To the extent Thompson alleges a denial of his statutory rights under CPL § 30.30 before this Court, that claim is exhausted, but based on state law, and thus is not cognizable on federal habeas review. See <u>Hodges v. Bezio</u>, No. 09-CV-3402, 2012 WL 607659, at *4 (E.D.N.Y. Feb. 24, 2012).

8

2001). Thompson has not attempted to demonstrate cause or prejudice, nor has he come forward with evidence tending to show that he is "factually innocent," so as to qualify for the "fundamental miscarriage of justice" exception. Id. Accordingly, Thompson's application for habeas relief on this ground is denied.

B. <u>The Prosecutorial Misconduct Claim</u>

Petitioner raises two complaints regarding the prosecutor's conduct. He contends that the prosecutor (1) directed officers to falsely arrest him so that she could appropriate his <u>pro se</u> legal materials and thereby gain a litigation advantage; and (2) presented a false court order to coerce him into consenting to a DNA swab.

Federal habeas relief is limited to prosecutorial misconduct that "so infected the trial with unfairness" as to deny due process. <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quotations omitted). To determine whether a denial of due process occurred, courts examine "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper [conduct]." <u>Floyd v. Meachum</u>, 907 F.2d 347, 355 (2d Cir. 1990) (citations omitted).

To start, the record does not support the claim that petitioner was falsely arrested. After OCME compared the DNA profiles created from the June 24th and July 20th crime scene materials to petitioner's DNA in early July, the state had probable cause to arrest and arraign Thompson. Nothing that occurred in the sequence of events leading up to his initial arraignment on July 18, 2005 negates that fact. Moreover, to the extent Thompson contends that his arrest was unlawful because it was connected to indictment 1105/05, which arguably applied only to the

other Wayne Thompson, that problem was remedied by the state court's dismissal of indictment 1105/05 and the prosecution's reindictment and rearraignment of petitioner under indictment number 2572/05. See supra note 5.

The record also does not support petitioner's contention that the prosecutor absconded with his legal work to get an upper hand in the case. When officers arrested Thompson, they did, in fact, take custody of his personal property, including his legal materials. (Tr. 430.) However, NYPD detectives testified under oath that they did not open or examine any of petitioner's belongings. (Tr. 431.) And the prosecutor similarly stated on the record that neither she nor anyone from her office ever opened the sealed envelope containing Thompson's paperwork. (Pretrial Tr. 94.) In fact, officers gave petitioner's papers to the prosecutor in the first place in an effort to facilitate Thompson's ability to have access to his legal materials pending trial, and the prosecutor specifically had petitioner produced in court so that she could return the material to him in person. (Pretrial Tr. 93–94.) Moreover, petitioner was given an opportunity to arrange for someone to pick up his property for him and he declined to do so. (Pre-trial Tr. 93.) Additionally, Thompson's claim that officers acted unlawfully when they gave the prosecutor his legal papers was investigated by the NYPD prior to trial, and determined to be entirely unfounded. (Tr. 231–33).

Thompson's other complaint is that the prosecutor "falsely charged [him] of being the defendant named in [indictment number 1105/05]" and falsely claimed that "a 'Show Cause Order' dated May 16[,] 2005" applied to him, when, in fact,

10

they both applied to the other Wayne Thompson. (Pet. Br. 2.) Thompson alleges that the prosecutor made these misrepresentations to coerce him into providing a sample of his DNA.

Again, however, the record belies Thompson's claim. In reality, on May 23, 2005, in proceedings before Justice Barry Kron, the prosecutor asked the court to grant an order permitting her to swab petitioner's mouth to determine whether or not he was the individual whose Florida DNA was connected to the June 24th and July 20th burglaries. (Proceedings Before Justice Kron, May 23, 2005 ("May 23 Proceedings"), 3.) After a lengthy discussion with petitioner and his legal advisor on the record, Justice Kron stated that he "reviewed the [prosecution's] paperwork," and believed that there was a "sufficient showing" for a court order. (May 23 Proceedings 15.) At that point, however, petitioner interrupted, stating, "I don't have any problem with giving them the swab. They can get it." (May 23 Proceedings 16.) To which the court responded, "So you consent to them taking a swab?" (Id.) And petitioner answered, "Yes, I am, sir." (Id.) Justice Kron then granted the prosecution's motion "on consent." (Id.) In fact, there was no presentation at all of a May 16, 2005 show cause order by the prosecution, and certainly no indication whatsoever of the prosecutor lying to the court in an effort to obtain Thompson's DNA.

In light of the above analysis, the Court finds that the state court's dismissal of Thompson's prosecutorial misconduct claim on the merits was not contrary to, or

an unreasonable application of, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

C. The Brady Claim

Thompson claims that the People failed to disclose certain exculpatory witness statements in violation of Brady v. Maryland, 373 U.S. 83 (1963).[9] Petitioner contends that "the prosecution was purposely withholding exculpatory information obtained from eyewitnesses to the July 20th [incident] who could have [told] the jury" that petitioner only entered the residence in question because he was "fleeing" after being "startled" when garden workers entered the abandoned house next-door where petitioner had been asleep. (Pet. Br. 2, 6.) According to petitioner, the testimony of those witnesses would have negated the "necessary element of intent" for the crime of burglary, resulting in his acquittal. (Pet. Br. 6.) Thompson contends that the prosecutor "lied to the court about those [witness] statements" to avoid having to disclose them. (Id.)

The prosecution, of course, is required to provide the defense with exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. Brady requires that the prosecution "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Pa. v. Ritchie, 480 U.S. 39, 57 (1987) (citing Brady, 373 U.S. at 87). A Brady violation

---

[9] To the extent that Thompson is relying on the state court rule articulated in People v. Rosario, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448, cert. denied, 368 U.S. 866 (1961) to challenge his conviction, his claim raises an issue of state law not cognizable on federal habeas review. See 28 U.S.C. § 2254(a); United States ex. Rel. Butler v. Schubin, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), aff'd, 508 F.2d 837 (2d Cir. 1975).

12

occurs when: "(1) the [prosecution], either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001) (citations omitted).

In this case, however, Thompson has failed to demonstrate that there was, in fact, any evidence that was kept from the defense. Petitioner claims that the prosecutor failed to disclose the statements of eyewitnesses to the July 20th incident, in violation of her Brady obligations. However, there is no evidence, other than petitioner's repeated assertions, that such statements exist. (See, e.g., Tr. 305–06, 344–45, 465, 469; Pretrial Tr. 88–89, 91.) Brady does not require the prosecution to turn over material it does not have. There was thus no violation of Brady, and Brady provides no vehicle for federal habeas relief.

### D. The Confrontation Claim

Thompson's principal allegation is that his Sixth Amendment right to confront the witnesses against him was violated when the trial court admitted into evidence DNA profiles produced by individuals who were not called as witnesses at trial. The individuals who testified at Thompson's trial, did not, themselves, produce the DNA profiles. The profiles were received into evidence as business records. The gravamen of petitioner's assignment of constitutional error is that the DNA profiles were testimonial in nature and their admission without the in-court

testimony of those who created them violated his confrontation rights under the terms of Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).[10]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witness against him." Crawford v. Washington, 541 U.S. 36, 53 (2004), announced a per se bar on the admission of "testimonial" out-of-court statements where the declarant is unavailable for cross-examination at trial. See also United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006) (summarizing Crawford's holding). The parameters of the per se bar, however, were not initially clear, because the Crawford Court declined to "spell out a comprehensive definition of 'testimonial.'" The Court did note that, at a minimum, the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68. It also indicated that "business records" were generally nontestimonial in nature. Id. at 55.

Since Crawford, of course, the Supreme Court has clarified the meaning of testimonial. In Davis v. Washington, 547 U.S. 813 (2006), the Court held that a statement is not automatically testimonial simply because the declarant reasonably believes it will be available for use at a later trial. On the other hand, in Melendez-

---

[10] Melendez-Diaz was controlling Supreme Court precedent at the time of the Appellate Division's decision in this case. Thus, the merits of petitioner's claim will be assessed according to its principles. See Bierenbaum v. Graham, 607 F.3d 36, 49 (2d Cir. 2010) cert. denied, 131 S. Ct. 1693 (2011) ("[A] federal court must apply the clearly established Supreme Court jurisprudence as of either the date of the pertinent state court adjudication on the merits, or the date when the state court conviction became final.") (internal quotation marks and alterations omitted).

Diaz v. Massachusetts, 557 U.S. 305, 310 (2009), the Court ruled that because "under the relevant Massachusetts law the[] sole purpose" of certain certificates of forensic analysis was to provide prima facie evidence of a defendant's guilt, the defendant was entitled, under the Sixth Amendment, to cross-examine the authors of those certificates. See also Vega v. Walsh, 669 F.3d 123, 126 (2d Cir. 2012). However, Melendez-Diaz also reaffirmed Crawford's position that, generally, "[b]usiness and public records . . . are not testimonial." Melendez-Diaz, 557 U.S. at 324.

Given these coordinates, Crawford and its progeny provide petitioner no route to a writ of habeas corpus. In fact, the Appellate Decision's decision in Thompson's case that his confrontation right was not violated is eminently reasonable and entirely consistent with relevant Supreme Court precedent. In Melendez-Diaz, the offending testimony consisted of sworn affidavits of unavailable witnesses providing prima facie evidence of the accused's guilt. The proof was, therefore, functionally identical to live, in-court testimony because it was offered to do "precisely what a witness does on direct examination," and thus created a confrontation issue. Melendez-Diaz, 557 U.S. at 310 (internal citation omitted). In contrast, the challenged reports here did not contain any sworn statements, let alone sworn statements providing prima facie evidence of Thompson's guilt. The experts in Thompson's case testified about their respective labs' procedures for creating DNA profiles, and offered their opinions about conclusions that could be drawn from those profiles. That is, they independently reviewed all the relevant data and

offered their own interpretations of that data in court. (Tr. 518–523, 550–55, 615–16, 619 631–32, 663.) To the extent adverse inferences against Thompson could be drawn from the DNA evidence, they could only be drawn from the conclusions offered in open court by live witnesses, subject to cross-examination, not from the underlying DNA profiles themselves. In short, none of the out-of-court data or reports involved in petitioner's case was akin to the testimonial certificates of analysis in <u>Melendez-Diaz</u>. The dispositional difference is that the experts offering the accusatory or adverse conclusions actually testified at Thompson's trial. <u>Melendez-Diaz</u>, 557 U.S. at 310.[11]

Since the Appellate Division's conclusion that there was no violation of Thompson's confrontation right was not contrary to, or an unreasonable application of, clearly established law, a writ of habeas corpus may not issue.

### E. The Improper Admission of DNA Evidence and Sufficiency of the Evidence Claims

Thompson's remaining claims challenging the admissibility of the Florida DNA profile (<u>see</u> <u>supra</u> note 4) and the sufficiency of the evidence are unexhausted

---

[11] The blow which eliminates all second-guessing about whether the Appellate Division's conclusion was reasonable is the Supreme Court's recent decision in <u>Williams v. Illinois</u>, 132 S. Ct. 2221 (2012). In <u>Williams</u>, the Supreme Court stated in dicta that the admission of DNA profile reports has no Confrontation Clause implications, reasoning that such reports are very different from extrajudicial statements such as "affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach." <u>Id.</u> In Thompson's case, the Second Department foreshadowed precisely the Supreme Court's reasoning in <u>Williams</u>.

because they were not raised in petitioner's letter for leave to appeal to New York's high court.[12] (See generally Leave Letter).

"Under limited circumstances," courts should "assume that the [New York] Court of Appeals would construe a petitioner's leave application as abandoning claims that the petitioner had pressed to the Appellate Division below," and find the claims unexhausted but procedurally barred. Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005). Habeas petitioners, particularly those who are pro se, must be given the benefit of the doubt. For instance, "when a petitioner either attaches an appellate brief to his application for leave to appeal without discussing any specific claims or asserts only some claims in the leave to appeal application and then explicitly states that the appellate brief is enclosed, every issue discussed in the appellate brief is fairly presented to the highest court of the state." Pines v. Barkley, 2006 U.S. Dist. LEXIS 99720, at *8–9 (S.D.N.Y. 2006).

Here, however, petitioner's leave application clearly raises certain claims, and not others. Thompson did not attach his appellate brief, or state that it was enclosed, and he does not reference the arguments he made to the Appellate Division anywhere in his application. (See generally Leave Letter.) Moreover, it seems that petitioner is cognizant of federal habeas exhaustion requirements. In discussing his confrontation claim, Thompson notes that although he is aware of a 2009 New York Court of Appeals case holding that DNA reports are nontestimonial, his "appeal

---

[12] Although respondent does not address these claims in its opposition brief, the Court cannot assume it has abandoned its exhaustion defense absent an express waiver. See 28 U.S.C. §2254(b)(3); see also supra note 7.

request must present this issue again . . . in order to preserve the issue for further possible judicial review." (Leave Letter 3.) As a result, the Court finds that Thompson's claims challenging the admissibility of the Florida DNA profile and sufficiency of the evidence are unexhausted.

Further, since petitioner no longer has a state court forum in which to raise these on-the-record claims, the Court deems the claims exhausted but procedurally barred. Spence, 219 F.3d at 170; see also Quintero v. Heath, No. 10-CV-8709, 2012 WL 4747181, at *7 (S.D.N.Y. Aug. 20, 2012), report and recommendation adopted, 2012 WL 4747213 (S.D.N.Y. Oct. 4, 2012) (assertion that evidence was improperly admitted is an "on-the-record" claim); Ortiz v. New York, No. 12-CV-1116, 2013 WL 1346249, at *10 (E.D.N.Y. Mar. 31, 2013) (challenge to the sufficiency of the evidence is an "on-the-record" claim). Because petitioner has not shown, or even advanced a claim of, cause and prejudice, or actual innocence, federal review of these claims is not authorized. Aparicio, 269 F.3d at 90. Accordingly, Thompson's remaining claims are dismissed.

## Conclusion

For all of the foregoing reasons, the petition for a writ of habeas corpus filed by Wayne Thompson must be, and hereby is, dismissed with prejudice, and the writ is denied. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. See 28 U.S.C. § 253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and

therefore in forma pauperis is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to enter judgment and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
April 1, 2014

s/Eric N. Vitaliano

**ERIC N. VITALIANO**
**United States District Judge**